UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WESTERN CREATIVE, INC.,

        Plaintiff,                                Case No. 12-11486

                                                    Paul D. Borman
v.                                           United States District Judge

                                                    Mona K. Majzoub
                                                    United States Magistrate Judge

SCI FUNERAL & CEMETERY
PURCHASING COOPERATIVE, INC., and
SERVICE CORPORATION
INTERNATIONAL, INC.,

        Defendants.
_____/

<u>OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
(2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Before the Court are Plaintiff Western Creative, Inc.'s ("Western" or Plaintiff) Motion for

Partial Summary Judgment (ECF No. 74) and Defendants SCI Funeral & Cemetery Purchasing

Cooperative, Inc. and Service Corporation International, Inc.'s (collectively "SCI" or Defendants)

Motion for Summary Judgment (ECF No. 76). SCI responded to Western's motion (ECF No. 79)

and Western replied (ECF No. 84). Western responded to SCI's motion (ECF No. 82) and SCI

replied (ECF No. 83). The Court held a hearing on October 16, 2014 on both motions. For the

reasons that follow, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion

and DENIES Plaintiff's motion, finding genuine issues of material fact remain as to Count III of

Plaintiff's Complaint.

1

**INTRODUCTION**

Defendants provide funeral, cremation and cemetery services across the country. Western is an advertising services agency that creates and develops advertising for clients like the Defendants, and then arranges on behalf of those clients for the placement of that advertising with various media outlets. This action involves Western's claim for damages, specifically the loss of a business relationship with Axcess Marketing Group ("Axcess") and the costs to defend a lawsuit filed against Western by Axcess, damages Western alleges were caused by SCI's disclosure of information that Western provided to SCI regarding certain business practices of Axcess. Western claims that SCI had agreed to keep the information provided to it by Western confidential and its failure to do so resulted in the Axcess litigation against Western and the eventual loss of Western's business relationship with Axcess. The Axcess litigation resolved in favor of Western on summary judgment, and Western seeks to recover attorney's fees and costs incurred in defending that lawsuit. Western also seeks to recover unpaid sales commissions it claims it is owed on advertising that it planned and placed but which was later cancelled by SCI after SCI terminated Western's services.

**I.    BACKGROUND**

**A.    Western is Introduced to SCI by Axcess, Begins Performing Creative Work for SCI in Conjunction With Axcess and Signs a Non-Disclosure Agreement With SCI**

In the Fall of 2008, Western was introduced to SCI by Axcess and began working for SCI in conjunction with Axcess. (ECF No. 76, Defs.' Mot. Summ. Judg. Ex. B, February 7, 2012 Deposition of Mark Young 43.) According to Axcess's principal, Brad Kelly, he brought Western in to work with Axcess to service Axcess's client, SCI. Initially, Western was to focus on the creative side, planning and developing advertising, and Axcess was to handle placement with the

media outlets.  *Id*. at 43-44, 46.  According to Mark Young, Western's principal, Axcess and its former creative partner, SWJ, were failing miserably at servicing the SCI account and Western was brought in to correct the situation.  Young Dep. 50-52.  According to Young, Phil Jacobs, SCI's Senior Vice President of Marketing, worked for Axcess before being hired by SCI and was good friends with Brad Kelly, Axcess's principal, and wanted to keep Axcess and Kelly on board with SCI.  Western was the life-line that Jacobs threw to buoy Axcess and Brad Kelly.  Young Dep. 50, 58.

In December, 2008, Western signed a Non-Disclosure Agreement ("NDA") with SCI, which sought to protect SCI's confidential information from disclosure by Western.  (Defs.' Mot. Summ. Judg. Ex. A, December 10, 2008 Non-Disclosure Agreement.)  Western's Principal, Mark Young, executed the NDA on behalf of Western and Russ Richmond, then SCI's Managing Director of Marketing, presented Young with the NDA as the representative of SCI.  *Id*. at 3; Defs.' Mot. Ex. C, May 8, 2013 Affidavit of Russ Richmond ¶¶ 4-6.

### B.    The Agency Agreement Between Western and SCI

In February, 2009, SCI and Western executed an Agency of Record Agreement, through which Western was appointed an agency of record for SCI with respect to SCI's advertising campaigns for their funeral, cremation and cemetery services.  (Defs.' Mot. Summ. Judg. Ex. E, February 11, 2009 Agency of Record Agreement ¶ 1.)  Services to be provided by Western for SCI included the purchase of cable, broadcast and satellite air time as well as placement of non-television advertisements including radio, print, inserts, direct mail solicitation and catalogue advertisements. *Id*.  The Agency Agreement was a document prepared by Western.  Young Dep. at 77.  The Agency Agreement contained the following compensation provision:

> For the placement of media WCI will receive a fifteen percent (15%) media commission (payable by the stations from gross rates or by the Client whose direct bill is for net rates only) as its sole compensation for the media placement under this agreement.

Agency Agreement ¶ 13. The Agreement also provided for the payment of commissions during a 90 day wind-down period in the event that either party terminated the Agreement:

> This Agreement shall continue in force until terminated upon ninety (90) days' written notice given by either party to the other, and WCI shall be entitled to receive full compensation on all advertising placed within said (90) day period, and in broadcast media with respect to broadcasts that occur during said period. WCI shall not be entitled to commissions on shortrate charges, nor be obligated to surrender commissions on refunds, invoiced by media subsequent to the effective date of the termination notice.

Agency Agreement ¶ 17.

### C.    The SCI Investigation Into Axcess's Billing Practices

In March, 2009, Axcess's principal, Brad Kelly, contacted Western's principal, Mark Young about the manner in which Western billed SCI for the creative work that Western was doing on the SCI work. According to Mark Young, the initial plan when Western was brought into the SCI account was that Axcess would split its 15% commission on print work with Western. Young Dep. 79-82. However, when it came time to share the commission, Brad Kelly conceived a different plan to avoid splitting the commission with Western that involved doubling the commission on the work, billing the media outlet for the work plus a single commission and then billing SCI for an extra 15% commission. Young Dep. 46-48, 50. Mr. Young was on vacation in the Cayman Islands when he received a call from Mr. Kelly proposing the double billing idea:

> A:    I got a phone call from Brad Kelly, and – in fact, as I told you, I was in the Cayman Islands . . . My wife was actually standing right next to me when Kelly told me, now, look, we're not going to split the commissions up, you're going to have to double the commission, and just increase the commissions and send SCI a bill with an extra fifteen percent.

4

My comment was, well, Brad, that's thirty percent commission, we can't do that.  His comment was, well, the work you guys are doing is working so well that they can afford to pay you extra fees, and I'm like, well, I'm glad it's working well, but we can't double bill, and his comment to me was . . . that Phil [Jacobs of SCI] has instructed us to tell you this is how he wants it done, which my answer was okay, Phil's the boss, if that's how he wants it done, then I guess that's how he wants it done.

A:     So, when I returned home, I contacted Russ Richmond. Now my purpose with contacting Russ Richmond was one of billing, so all with me here, we've just been told by another agency, who brought us in to the account, who Mr. Jacobs made it clear that we were to work together, that Mr. Jacobs has just ordered us to double bill his firm; highly inappropriate, not good for the company, but he is the boss, so he has the right to over-bill himself.

I called Mr. Richmond because I needed to know from Mr. Richmond how do we bill this, so I called Russ and said, Russ, when we send you invoices, is it okay that the invoice we send you does not match the invoice from the media outlet, or do you just want us to send you our invoice and not send you media invoices, and which Mr. Richmond said why the hell would I let you send me an invoice that doesn't match the media, and that's the moment I knew I had a problem. . . I then told Mr. Richmond, well, Brad Kelly has instructed us to change the way we're doing billing, and informed him very quickly, Russ, you got to understand they're claiming this is coming from Phil Jacobs.

Young Dep. 48-49.  Mr. Young testified that at this point, he became concerned that he was in the

middle of something that could cost him his job: "The issue in my mind was if, indeed – if indeed,

Phil Jacobs was telling us to over-bill his company, and if, indeed, the number two guy in line, Russ

Richmond, was in disagreement with that, I stood the chance to get fired by one of them." *Id*. at 61.

Mr. Young stated that Mr. Richmond assured him that he would not tell anybody else about the

situation without first informing Mr. Young.  *Id*. at 62.

Mr. Richmond did contact Mr. Young and informed him that he [Mr. Richmond] was going

to talk to a man named Tim McConnell, SCI's internal auditor.  *Id*. at 64.  Apparently, after first

hearing this story from Mr. Young, Mr. Richmond did some investigation on his own into Axcess's

previous invoices to SCI and found numerous irregularities, causing him to contact Mr. McConnell and, not identifying Mark Young as the source of any information but just based on his own investigation of the invoices, asked Mr. McConnell to look into the Axcess invoicing. *Id*. at 64-65, 68. Based upon McConnell's review, an internal investigation was initiated and, as part of that investigation, McConnell contacted Mark Young and asked to meet with him, initially just to find out what Mark Young knew about invoicing in general. *Id*. at 68. Mr. Young does not believe that Russ Richmond ever disclosed to McConnell the details of the arrangement that Brad Kelly had suggested regarding the double billing, *id*. at 68-69, although McConnell testified that Richmond did relay the Brad Kelly story, and identified Mark Young as its source, when McConnell first met Russ Richmond. (ECF No. 86, Defs.' Reply Ex. H, June 28, 2013 Deposition of Thomas Matthew McConnell 16.) In the following days, McConnell contacted Young several times trying to "figure out the puzzle" of the Axcess invoices. *Id*. at 76.

As the investigation progressed, Gregory Sangalis, Senior Vice President, General Counsel and Secretary of Defendant SCI International, became involved. (ECF No. 86, Defs.' Supp. Reply Ex. G, June 27, 2013 Deposition of Gregory T. Sangalis 15.) Mr. Sangalis was asked by his supervisor, Tom Ryan, the CEO of SCI Int'l, to become involved in the investigation. *Id*. at 18. Mr. Sangalis explained that Phil Jacobs reported to the COO of SCI Int'l, Mike Webb, who in turn reported to Mr. Ryan. *Id*. at 18-19. Through Mr. McConnell, Mr. Sangalis arranged to have a phone conversation with Mr. Young, which took place on April 30, 2009. Mr. Sangalis and Mr. McConnell were in Mr. Sangalis's office at SCI International headquarters on speaker phone and Mr. Young was in his office participating by phone. *Id*. at 37–39; ECF No. 86, Defs.' Supp. Reply, Ex. H, June 28, 2013 Deposition of Thomas Matthew McConnell 57. Mr. Young relayed all of the

6

same information that he had divulged to Mr. McConnell earlier regarding Brad Kelly and the double billing idea. *Id*. at 47-50. Sangalis testified that at no point during the April 30, 2009 telephone conference call with McConnell and Young did Sangalis say anything to Mr. Young about keeping things confidential nor did Mr. Young mention anything about keeping the conversation confidential. *Id*. at 40-42. McConnell also testified that at no point during the conversation with Sangalis and Young on April 30, 2009, did Sangalis indicate that anything Mr. Young said would be kept confidential. McConnell Dep. at 65. Among Sangalis's handwritten notes from the investigation was the following notation: "Do not talk to anyone about this discussion." Sangalis Dep. at 34. He explained that this was a note to himself to remind everyone with whom he spoke during the investigation not to discuss their conversation with Sangalis with anyone else. *Id*. at 35. He did not believe he gave this admonition to Young because Young was not an employee of SCI and Sangalis was not in a position to direct his conduct. *Id*. at 43. Also, Sangalis explained, as the person making the allegations, Young was unlikely to share the information with anyone else. *Id*. Sangalis has no recollection of Young expressing a concern that the information he divulged would get back to Axcess. In fact he remembers Young saying "I just want to do the right thing . . . and if it affects people, I just want to be upfront." *Id*. at 41. Sangalis later relayed the substance of the April 30, 2009 conversation with McConnell and Young to his superior, Mr. Ryan, the CEO of SCI Int'l. *Id*. at 56. Sangalis then conducted several interviews of SCI personnel, concluding with an interview of Phil Jacobs. *Id*. at 67-68. Mr. Sangalis testified that at no point in his conversation with Phil Jacobs did he ever identify Mark Young as the source of any of the information about which he was questioning Mr. Jacobs. *Id*. at 69-70. "We asked generic questions. I don't remember ever specifying so-and-so said this, what do you say to that?" *Id*. Mr. Sangalis did not speak to Mr.

Kelly or anyone at Axcess as part of his investigation. *Id*. at 72. The only individuals who had knowledge of the April 30, 2009 phone call with Mark Young were Mr. McConnell, Mr. Young, Mr. Ryan and Mr. Sangalis. *Id*. at 75.

With regard to Mr. Young's specific allegations regarding Axcess's possible double billing practices, Mr. Sangalis testified that the audit was inconclusive with respect to those specific items but found Axcess guilty of sloppy engagement, sloppy billing and the appearance of favoritism to vendors. *Id*. at 72-73. As a result of the investigation, Phil Jacobs did not lose his title or his pay but was "reprimanded" for having "fairly loose controls on engagement and billing in his department." *Id*. at 76-77.

On or about September 26, 2011, Western received notice that SCI was terminating the Agency Agreement. Jeffrey Peterman, director of Western's billing department, received the letter of termination on September 28 or 29, 2011. (ECF No. 76, Defs.' Mot. Summ. Judg. Ex. F, April 18, 2013 Deposition of Jeffery Peterman 24, 36.) Western ceased all work for SCI in late December, 2011. Young Dep. 185.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

8

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 324. "The test is

9

whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). In doing so, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial. . . . In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it

should be interpreted in a way that allows it to accomplish this purpose." *Celotex*, 477 U.S. at 323-34.

## III.  ANALYSIS

### A.  Defendants are Entitled to Summary Judgment on Western's Claim that SCI Breached the NDA Agreement (Count I)

Western claims that SCI's disclosure of the information provided by Young to SCI during the Axcess investigation violated the NDA that Young signed with SCI. The Court concludes that the plain language of the NDA, which unambiguously defines only SCI as the "Disclosing Party" whose "Confidential Information" was to be protected, bars Western's claim under this Agreement. The parties entered into the NDA long before Young learned of and informed SCI of Brad Kelly's alleged suggestion that Western double bill SCI for commissions and the Court finds no basis to reform or rescind the NDA based upon an alleged "mutual mistake."

The NDA in its preamble defines SCI as the "Disclosing Party" and Western as the "Receiving Party" and further provides:

> The Receiving Party [Western] shall use the Disclosing Party's [SCI] Confidential Information only for the purpose of evaluating the Relationship and for the purposes of the ongoing Relationship, and shall protect such Confidential Information from disclosure to third parties, using the same degree of care used to protect its own proprietary information of like importance but in any case using no less than a reasonable degree of care. The Receiving Party may disclose the Disclosing Party's Confidential Information to its affiliates, its employees and its consultants, in each case if the affiliates, employees, and consultants have a need to know . . . .

ECF No. 76, Defs.' Mot. Summ. Judg. Ex. A ¶ 1 (alteration added). The NDA defines an "affiliate" as "any person or entity controlling, controlled by or under common control with a Party." *Id.* ¶ 7. The NDA defines "Confidential Information" as follows:

> "Confidential Information" means information in whatever form disclosed by the Disclosing Party to the receiving Party before, on or after the Effective Date hereof

11

> which relates to the Disclosing Party's business, or the Relationship [further defined in the NDA as the business relationship between SCI and Western], including without limitation business, financial and technical materials, information and data, or any other disclosure not directly related to the Relationship, which is nevertheless disclosed as a result of or in connection with the Parties' discussion of the Relationship.

NDA ¶ 1 (alteration added). Importantly, the NDA also contains an integration clause and a choice of law provision dictating that Texas law governs interpretation and construction of the Agreement:

> This Agreement: (a) is the complete Agreement of the Parties concerning the subject matter hereof and supersedes any and all prior agreements, understandings or discussions with respect to the subject matter hereof . . . (c) may not be amended or in any manner modified except in a writing signed by the Parties; and (d) shall be governed and construed in accordance with the laws of the State of Texas.

*Id*. ¶ 8.

As an initial matter, the Court notes that both SCI and Western cite only Michigan law in their arguments relating to the NDA. Neither party acknowledges that the NDA itself specifies that Texas law governs the construction of the NDA. This Court, sitting in diversity, applies the choice of law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941). Under Michigan choice of law principles, the parties contractual choice of law will be applied absent circumstances not clearly present here. *See Hudson v. Mathers*, 283 Mich. App. 91, 96-97 (2009). Thus, there is no obvious barrier to the Court's application of the parties' choice of Texas law. However, when determining the applicable law, this Court must also consider the expectations of the parties regarding their choice of law. *Id*. Because the parties appear to have been operating under the assumption that Michigan law applies to the construction and enforcement of the NDA, the Court has examined the arguments relating to the NDA under both Michigan and Texas law and finds, as discussed below, that it would reach the same result under both.

12

Nothing in this NDA suggests that it creates mutual duties of non-disclosure. This NDA does not purport to define or protect Western's Confidential Information in any way, shape or form. Apparently conceding this, Western alleges that, "[i]rrespective of the language of the NDA," it was induced to sign the NDA on the oral assurance that its protections were mutual. In support of this assertion, Western relies on the testimony of Mr. Young, who claims that such an understanding was made manifest at the signing of the NDA, as well as the Affidavit of Russ Richmond, who testifies that he presented the NDA to Mr. Young and told Mr. Young that SCI intended the NDA to be mutual, i.e. that it also would obligate SCI to protect any Confidential Information provided to SCI by Western. (ECF No. 82, Pl.'s Resp. Ex. F, May 8, 2013 Affidavit of Russ Richmond.)

The Sixth Circuit has recognized that the court's most fundamental task when interpreting the language of a written agreement is to determine the intent of the parties. *Vision Information Servs., LLC v. Comm'r of Internal Revenue*, 419 F.3d 554, 558 (6th Cir. 2005). The inquiry is "an objective" one and the starting point for determining that intent is the plain language of the contract. "We have explained that '[t]he intent of the parties is best determined by the plain language of the contract.'" *Id*. (quoting *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003)) (alteration in original). Where that language is clear and unambiguous, the court can go no further in divining the intent of the parties. *Id*. at 559.

The NDA is unambiguous in its definition of the Disclosing (SCI) and Receiving (Western) parties and therefore these terms are not subject to interpretation. The NDA plainly protects SCI's, and only SCI's, Confidential Information. The Court is not permitted to look beyond the plain language, to Mr. Young's testimony or to Mr. Richmond's affidavit, to construe the language of a contract that is plain and unambiguous. *Moore v. Kimball*, 291 Mich. 455, 461 (1939) (where "the

13

language of the agreement leaves no doubt as to its meaning . . . it must be considered without regard to extraneous facts [and] [t]he intention of the parties is to be deduced from the language employed by them") (citation omitted) (alterations added); *Hicks v. Castille*, 313 S.W.3d 874, 880, 880 n.2 (Tex. App. 2010, pet. denied) (finding that a contract that can be given a definite or certain legal meaning is unambiguous and noting that "a party may not introduce parol evidence to vary the terms of an unambiguous contract").

Apparently acknowledging that the NDA is unambiguous and by its clear and unequivocal terms protects only SCI's Confidential Information, thus barring introduction of parol evidence, Western argues that an exception to the bar should be applied here because the parties were operating under a mutual mistake when they executed the NDA.  Western argues that Russ Richmond (then a representative of SCI) and Mark Young (of Western) both intended that the agreement be "mutual," i.e. that both Western's and SCI's Confidential Information would be protected.  In support, Western relies on Mr. Young's testimony and Mr. Richmond's Affidavit. Even assuming the truth of both Mr. Young's testimony and Mr. Richmond's Affidavit, there is no basis here for a claim of mutual mistake.

The integration clause of the NDA expressly provides that the executed agreement "supersedes any and all prior agreements, understandings or discussions," rendering parol evidence inadmissible to vary the terms of the NDA.  Under Michigan law, "when the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete "on its face" and, therefore, parol evidence is necessary for the "filling of gaps." 3 Corbin, Contracts, § 578, p. 411." *UAW-GM Human*

*Resource Center v. KSL Recreation Corp.*, 228 Mich. App. 486, 502 (1998). *See also Newburgh/Six Mile Ltd. P'ship II v. Adlabs Films USA, Inc.*, 724 F. Supp. 2d 740, 754 (E.D. Mich. 2010) ("Although there exists an exception to the [parol evidence] rule for the threshold question of whether a contract is fully integrated, when the parties include an express integration clause in their written contract, the clause is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete "on its face" and, therefore, parol evidence is necessary for the 'filling of gaps.'") (quoting *UAW-GM Human Res. Ctr.,* 228 Mich. App. at 492). There are no allegations here that the alleged mutual mistake related to the integration clause itself or that the contract was "incomplete on its face," necessitating the "filling of gaps." Michigan law precludes parol evidence to vary the terms of this fully integrated NDA.

Texas law is in accord with Michigan law in holding that parol evidence cannot be used to vary or contradict the terms of a contract that contains an integration clause. *Bandera Drilling Co., Inc. v. Sledge Drilling Corp.*, 293 S.W.3d 867, 871 (Tex. App. 2009) ("When a contract contains a merger or integration clause, the contract's execution presumes that all prior negotiations and agreements relating to the transaction have been merged into the contract, and it will be enforced as written and cannot be added to, varied, or contradicted by parol evidence."). Under Texas law, a party seeking to avoid application of the parol evidence rule based upon an alleged mutual mistake must present "clear, exact, and satisfactory evidence," of mutuality of mistake. *Estes v. Republic Nat'l Bank of Dallas*, 462 S.W.2d 273, 275 (Tex. 1970). The party claiming mutual mistake must establish "two basic requirements" before reformation is granted: "first, the party claiming the relief must show what the parties' true agreement was, and second, he must show that the instrument

15

incorrectly reflects that agreement because of a mutual mistake." *Estes*, 462 S.W.2d at 275. It is not sufficient to merely establish that there was a different understanding to which both parties agreed:

> The party seeking reformation must of course prove what the true agreement was, but his case is not made by proof that there was an agreement which is at variance with the writing. He must go further and establish the fact that the terms or provisions of the writing which differ from the true agreement made were placed in the instrument by mutual mistake.

*Id*. (internal citation and quotation marks omitted). Viewing the facts in the light most favorable to Western, there may be a genuine issue of material fact regarding the first requirement, i.e. whether Richmond and Young had verbally agreed that the NDA would be mutual. However, there is no evidence of the second requirement or even a claim here that the parties intended the written NDA that they actually signed to contain different language that would have indicated mutual protection. There is no claim that the NDA actually "misstated" the fact that only SCI was a "Disclosing Party" whose Confidential Information would be protected. Richmond's Affidavit states that he verbally assured Young that the NDA would operate mutually in order to induce him to sign the NDA, but there is no evidence that the parties meant to, but by mutual mistake failed to, include such mutuality in the written Agreement that they signed or believed that as written and signed the NDA specified Western as a Disclosing Party. These facts do not form the basis for a claim of mutual mistake under Texas law and parol evidence is inadmissible to vary the meaning of the unambiguous NDA.

Notably, there is no claim in this case that Western was fraudulently induced to sign the NDA. The salient fact here is that Mr. Young read and signed an Agreement that unequivocally protected only SCI's Confidential Information and that expressly stated that it superseded all prior "agreements, understandings or discussions." Young Dep. 26-27. He now claims that a verbal

16

statement that he never requested be included in written NDA, which varies from the terms of that unambiguous Agreement that Mr. Young read and signed, was made to him by Mr. Richmond prior to signing that Agreement, Young Dep. 27, and should now be enforced despite the clarity of the document he signed precluding reliance on any such pre-contractual understanding. The language of the fully integrated NDA is unambiguous and parol evidence is not admissible to vary its terms under either Michigan or Texas law. Plaintiff's claim of breach of contract based on the NDA Agreement (Count I) fails to create a genuine issue of material fact that requires submission to a jury.

**B. Defendants are Entitled to Summary Judgment on Western's Claim That SCI Breached an "Oral Investigative Confidentiality Agreement" (Count II)**

Western claims that during the April 30, 2009, telephone conference with Sangalis and McConnell, Sangalis promised Young that the information Young disclosed about Brad Kelly's suggesting a double billing practice would be kept confidential and that SCI breached that oral agreement by disclosing the information. Viewing the facts in the light most favorable to Western, a genuine issue of fact exists as to whether SCI promised Mr. Young that it would keep the information he provided about Mr. Kelly and Axcess confidential. Western mistakenly asserts in its brief that "it is not disputed that Sangalis verbally assured Young that all information provided for the internal audit would be held in strict confidence." (ECF No. 82, Pl.'s Resp. 10.) Indeed, as Western's counsel acknowledged at the hearing on this matter, it is steadfastly disputed, by both Mr. Sangalis and Mr. McConnell, that any such assurances were either sought by Mr. Young or given by Mr. Sangalis at any point in time. Thus, at a minimum, a question of fact exists as to whether the representation was made. However, though this issue of fact may be genuine, it is not material if the alleged oral agreement cannot stand as a matter of law, even if made, due to the operation of the

17

statute of frauds.

Mr. Young testified that he believed the alleged oral investigative confidentiality agreement was to last in perpetuity.  Young Dep. 137.  Apparently conceding that the statute of frauds governs the claimed oral investigative confidentiality agreement, *see* Mich. Comp. Laws § 566.132 requiring an agreement that cannot be performed within a year to be in writing and signed by the party to be charged, Western argues that SCI should be equitably estopped from relying on the statute of frauds as a defense in this action.  "Equitable estoppel may arise where (1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe *facts*, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those *facts*."  *Lakeside Oakland Dev., L.C. v. H&J Beef Co.*, 249 Mich. App. 517, 527 (2002) (emphasis added).

Western cannot invoke the doctrine of equitable estoppel because the defense cannot be used to avoid the statute of frauds where the alleged misrepresentation relates to a future promise rather than a past or existing *fact*.  *Cuddihy v. Wayne State University Bd. of Governors*, 163 Mich. App. 153, 156-57 (1987) (finding the doctrine of equitable estoppel applies only to a misrepresentation of an existing fact and does not apply to a promise of future conduct); *Wier v. Countrywide Bank, N.A.*, No. 10-11468, 2011 WL 1256944, at *5 (E.D. Mich. March 31, 2011) (rejecting plaintiff's equitable estoppel argument where "the statements underlying Plaintiff's misrepresentation claim are not facts, but rather statements of future expectations, or mere opinion").  The alleged promise made by Mr. Sangalis to agree not to disclose to anyone in the future the information divulged by Mr. Young is not a misrepresentation as to a past or existing fact and cannot form the basis for a claim of equitable estoppel.  The statute of frauds applies here and bars Western's claim premised

18

on an alleged oral agreement that, by Mr. Young's own admission, was to last in perpetuity. Defendants are entitled to summary judgment on Count II of Western's Complaint.[1]

### C.   Genuine Issues of Material Fact Exist Regarding Western's Claim that SCI Breached the Agency Agreement and Therefore Neither Party is Entitled to Summary Judgment on This Claim (Count III)

Both parties have moved for summary judgment on Count III of the Complaint seeking unpaid commissions under the Agency Agreement.[2] On this claim, the Court concludes that genuine issues of material fact preclude summary judgment in favor of either party. "A contract is ambiguous if the language is susceptible to two or more reasonable interpretations." *D'Avanzo v. Wise & Marsac, P.C.*, 223 Mich. App. 314, 321 (1997). The Agency Agreement is subject to competing reasonable interpretations and therefore is ambiguous on the issue of Western's entitlement to commissions post-termination on advertisements that it had placed for SCI but which were cancelled by SCI and therefore never ran in the 90-day post termination period. "Although the construction of the terms in a contract is generally a question of law for the court to determine, where [a contract's] meaning is obscure and its construction depends upon other and extrinsic facts

---

[1] Under the facts that Western would have this Court accept, this claim is also barred by the terms of unambiguous NDA, which is discussed at length *supra*. Mr. Young testified that he did not reference or rely on the NDA at the time to protect his disclosures to Mr. Sangalis because, he asserts, the alleged oral investigative confidentiality agreement made by Mr. Sangalis "superceded" the NDA. Young Dep. 34-35. But the NDA contained an express integration clause and also provided that the NDA "may not be amended or in any manner modified except in a writing signed by the Parties." NDA ¶ 8. Thus, if as Mr. Young testified the alleged oral investigative confidentiality agreement offered by Mr. Sangalis was intended to "supercede" the NDA, it is unenforceable for the separate and independent reason that the NDA could not be amended or modified except by a writing signed by both Parties.

[2] The Agency Agreement specifies the application of Michigan law (Agency Agreement p. 3), the parties appear to agree that Michigan law applies and the Court will apply Michigan law. *See Hudson*, 283 Mich. App. at 96-97.

in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions." *Id.* at 319 (internal citations and quotation marks omitted) (alteration in original). The extrinsic evidence relied upon by the parties here does little to unmuddy the waters. *See Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1070 (6th Cir. 2008) ("If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper.").

There is no dispute that, while the parties were operating under the Agency Agreement, if an advertisement was planned and placed with a media outlet but was cancelled by SCI before it actually ran, Western was not paid a commission. Jeffrey Peterman, director of billing for Western, explained:

> [I]n 2011, after placing several million dollars worth of advertising, such as in Chicago and Houston, and I believe Dallas and other large markets, they were cancelled [by SCI] prior to the notification that we were no longer the agency, and we did not charge [SCI] for any commission for advertising that ran – that would have run. We only charged, and we only invoiced for media that did run prior to the cancellation.

Peterman Dep. 32 (alteration added). Corrine Watson, who handled billing for Western, testified that during the life of the Agency Agreement, Western would not bill SCI until Western had the media outlet backup, i.e. an affidavit for radio or tv or tear sheets for print advertising, that indicated when and where and how the ad had actually aired or run. (ECF No. 76, Ex. G, April 18, 2013 Deposition of Corrine Watson 17-20.) *See also* (ECF No. 83, Sept. 30, 2013 Affidavit of Janis Jarosz ¶¶ 11-12.)

Western claims, however, that once notice of termination was given under the Agency Agreement, the payment of commissions was to be governed by paragraph 17, which according to Western, provides that commissions will be paid on advertisements that were placed to run during

that 90-day wind down period, even if those ads are in fact cancelled and never ran.  According to

Young, he is seeking commissions for advertising that was actually placed with a media outlet and

scheduled to run during the 90-day post termination period but never ran because the client (SCI)

cancelled the ads after it terminated Western's contract.  Corrine Watson explained that she created

the Open Balance calculations on which Western bases its $53,668 damage claim  on invoices she

prepared and sent to SCI for "commissions that were due for media placed:"

> Q:      When you say invoices created, were these invoices created by the media
>         outlets or created by Western Creative?
>
> A:      They were created by Western Creative for the commissions that we were
>         due for media placed.
>
> Q:      So this would have been the fifteen percent that you were due for media
>         actually placed?
>
> A:      Right.
>
> Q:      When you say media placed, was this fifteen percent based upon media that
>         had actually, you know, run?
>
> A:      It was media that was placed by the client to book for them, that they wanted
>         to run and then they cancelled the contract.
>
> Q:      So this media never ran?
>
> A:      Not that I'm aware of.  Some may have ran, because we didn't get the
>         cancellation, but weren't invoiced or billed for it.
>
> Q:      But if it actually ran, wouldn't the media outlet have billed you for that?
>
> A:      Yes.
>
>                       *                    *                    *
>
> Q:      So, if the media didn't run and you didn't pay for it, and it was cancelled,
>         these [are] just commissions that you believe you should have received for
>         having booked the media?

A:     Right. According to our AOR [Agency of Record Agreement].

Q:     And what paragraph of the AOR says you're entitled to commissions for ads that did not run?

A:     That would be I believe 17.

Q:     Okay. What language in 17?

A:     WCI shall be entitled to receive full compensation on all advertising placed within said ninety-day period.

Q:     Even if it didn't run?

A:     Correct.

Watson Dep. 25-28 (alterations added).

All of the invoices that back-up the Open Balance damage calculation were for advertising that was actually booked for SCI to run at a date certain in the future. *Id*. at 37. Western put the Open Balance sheet together as a guide for the client "showing the weeks and the time period that their media is booked." *Id*. Watson used this guide to let SCI know the specific media that had been booked but was cancelled and on which the commissions were based. *Id*. She concludes that the amount that SCI owes Western for unpaid commissions on ads that were placed by Western to run in the 90-day period but were cancelled by SCI post-termination is $53,668. An earlier $66,000 figure that had been alleged may have been calculated before she received a refund from a station or a publication that she then applied to an open invoice. *Id*. at 29-30.

SCI argues that the Agency Agreement must be read as a whole and that paragraph 13 of the Agency Agreement provides that commissions are paid from fees paid to the media outlets. If the media outlets do not ultimately run the advertisement, they receive no fees, and there is no source for commissions. SCI argues that it has no obligation to pay commissions independent of payments

actually made to the media outlet. Peterman agreed that while the parties were operating under the Agency Agreement, when SCI directed that a certain ad that had been placed be cancelled, Western did not receive a commission on that media that did not actually run. SCI says this is evidence of course of dealing.

But pre-termination conduct, according to Western, is contractually governed by a different set of rules, those set forth in paragraph 13 of the Agency Agreement. During the course of the agency relationship, Young explains, when there is a cancellation there is a continuing relationship with SCI and there is always another and different placement on which commissions will be earned down the road. Therefore, during the course of the agency relationship, commissions are not paid on cancelled advertisements. However, post-termination, Western asserts, paragraph 17 governs and provides for commissions on advertising that was placed for that 90-day period but cancelled by SCI. Importantly, after notice of termination was given, and throughout the 90-day wind down period, Western was still obligated to, and did, do all of the work necessary to contact the media outlets and cancel placed advertisements at SCI's request. Peterman Dep. 37.

Further support for Western's interpretation of the Agency Agreement is the language of paragraph 17 that precludes commissions on shortrate charges in the 90-day wind down period. Paragraph 17 provides that Western "will not be entitled to commissions on shortrate charges . . . invoiced by media subsequent to the effective date of the termination notice." Shortrate charges occur when SCI cancels advertising that was the subject of long-term contract, where the rate had been negotiated up front based upon a certain volume of advertising. If SCI cancels such a placement, the media outlet applies a "shortrate charge," or upcharge, to compensate for the volume discount it had negotiated. Thus, Western argues, paragraph 17 of the Agency Agreement clearly

23

contemplates that *something* will paid to Western in the event that media is placed but cancelled post-termination because it expressly states that Western will not be entitled to commissions on short rate charges invoiced by a media outlet after the termination date, implying that it *is* entitled to commissions on cancelled ads otherwise. Because shortrate charges by definition only occur in the event of the client's cancellation of a long term contract, Western argues, the Agreement clearly contemplated post-termination commissions on other cancelled work, i.e. cancelled work that did not trigger a shortrate charge, in the 90-day wind down period.

SCI argues that under Western's reading of the Agency Agreement, Western could terminate the contract, cancel all of the advertisements that had been placed to run in the 90-day time period and then demand commissions on the very media it had cancelled. The fact is that Western never did, and could not, cancel media without SCI's approval. "We do not cancel media, we do not place media without authorization from the client." Peterman Dep. 37. There is no evidence to the contrary.

SCI also argues that its interpretation of paragraph 17 is supported by the reference in that paragraph to broadcast ads that "occur" during the 90-day period. If a broadcast ad has to "occur," SCI reasons, then a print advertisement has to actually "run." Why, SCI asks, would the agreement treat print and broadcast media differently in the 90-day post termination period? No response to this inquiry was forthcoming from Western.

In short, SCI wants to equate "placed" with "run" and Western wants to equate "placed" with "booked" or "placed to run." After receiving notice of termination, Western had no control whatsoever over whether an ad ran, and it was obligated during the 90-day wind down period to follow SCI's directives to cancel a number of ads that were scheduled to run, and therefore would

have been "placed" under SCI's definition, during that time frame.  Peterman Dep. at 37.   It makes little sense that in drafting this Agreement, Western would have intended "placed" to mean "run" for purposes of paragraph 17.   Because SCI could, and it appears did, cancel after receiving notice of termination every ad that Western had planned and booked, if "placed" meant "run" in the context of paragraph 17, the provision would be entirely illusory as to Western.  On the other hand, if an ad is placed but not run, it is undisputed that the media outlet is never invoiced and there is no "source" for Western's commission, which according to paragraph 13 of the Agency Agreement is Western's only source of payment for the services rendered under the Agreement.  Neither the language of the Agency Agreement, nor the extrinsic evidence, is sufficient to definitively resolve the parties' conflicting interpretations of paragraph 17.  Accordingly, Michigan law dictates that neither party is entitled to summary judgment on the issue of Western's entitlement to post-termination commissions.  *See Mahnick v. Bell Co*., 256 Mich. App. 154, 160 (2003) ("Because the contract is subject to more than one reasonable interpretation, factual development is necessary to determine the intent of the parties and summary disposition is inappropriate.").  Summary Judgment is denied to both parties on this claim and Count III shall proceed to a trial on the merits.

**D.     Defendants are Entitled to Summary Judgment on Western's Claim Under the Michigan Sales Representative Act (Count IV)**

Plaintiff claims that he is owed commissions by SCI under the Michigan Sales Representative Act (the "SCRA") which provides in relevant part:

Sec. 2961. (1) As used in this section:

(a) "Commission" means compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the amount of orders or sales or as a percentage of the dollar amount of profits.

(b) "Person" means an individual, corporation, partnership, association,

25

governmental entity, or any other legal entity.

(c) "Prevailing party" means a party who wins on all the allegations of the complaint or on all of the responses to the complaint.

(d) "Principal" means a person that does either of the following:

(i ) Manufactures, produces, imports, sells, or distributes a product in this state.

(ii ) Contracts with a sales representative to solicit orders for or sell a product in this state.

(e) "Sales representative" means a person who contracts with or is employed by a principal for the solicitation of orders or sale of goods and is paid, in whole or in part, by commission. Sales representative does not include a person who places an order or sale for a product on his or her own account for resale by that sales representative.

Mich. Comp. Laws § 600.2961.

Western has not established that under the Agency Agreement with SCI it acts as a "sales representative" as that term is defined in the SCRA or that the advertisements it creates are "sold" or would be considered "goods" as that term is understood under the SCRA.  Western claims that the Agency Agreement "demonstrates that SCI hired Western to, *inter alia*, solicit orders and placements of the goods (advertisements) produced."  ECF No. 82, Pl.'s Resp. 19.  Contrarily, in its response to Defendants' motion for summary judgment, Western summed up its work for SCI as follows: "Plaintiff and Defendants entered into a contract pursuant to which Plaintiff rendered advertisement services for Defendants and Defendants paid Plaintiff commissions for those services rendered."  In fact, Western created advertising and arranged for air time or print space from media outlets for the placement of those advertisements.  The media outlets bill SCI for the ads they run and it is this amount that serves as the basis for Western's commission.  Young Dep. 40-41. Western

is performing a service for SCI, creating advertising and securing media placements for that advertising, to assist SCI in marketing its cemetery services.

Even assuming that Western's statement that it was engaged by SCI to "solicit orders for advertisements" accurately describes the work it performed, Western's SCRA claim depends upon a finding that the definition of goods under the SCRA includes services rendered in purchasing media placements.  However, Western provides no legal support, other than a citation without elaboration to Black's law dictionary definition of "goods" as "tangible or movable personal property," for its contention that the work it performs under the Agency Agreement constitutes the sale of "goods" or the solicitation of orders for goods under the SCRA.[3]

The term "goods" is not defined in the SCRA.  "Unless defined in the statute, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used."  *Mahnick*, 256 Mich. App. at 161.  Michigan courts have recognized that "[g]oods are defined as possessions, esp[ecially] movable effects or personal property and as articles of trade; merchandise."  *Id*. at 162 (internal citation and quotation marks omitted) (second alteration in original).  Based upon these definitions, the Court finds that Michigan courts would conclude that Western's creation and placement of advertisements for SCI's funeral services would not be considered the solicitation of orders for or the sale of goods under the SCRA. *See Mahnick*, 256 Mich. App. at 162-63 (finding that a project estimator, whose job was to estimate the cost of completion of various jobs on which the defendant was to bid, was not engaged in the solicitation for the order or sale of goods even though his commission was determined with

---

[3] Interestingly, Plaintiff omits the balance of the Black's definition which states: "esp.., articles of trade or items of merchandise."  One would have to strain to imagine Western's advertisements created under contract specifically for SCI as "articles of trade" or "items of merchandise."

reference to the overall project cost and concluding that "[s]ervices do not constitute goods or products within the meaning of the SCRA"). *See also Franklin Publications, Inc. v. Gen'l Nutrition Corp*., No. 05-cv-1061, 2007 WL 2071914, at *5 (S.D. Ohio July 13, 2007) (recognizing that "[a] contract for advertising is a contract for a service, not for the sale of goods"). Western was an agency of record for SCI with respect to SCI's "advertising campaigns for their funeral, cremation and cemetery services," including the "purchase of cable, broadcast and satellite airtime," for the advertisements it created. *See* Agency Agreement ¶ 1. Even Western described the contractual relationship as one for services: "Plaintiff and Defendants entered into a contract pursuant to which Plaintiff rendered advertisement services for Defendants and Defendants paid Plaintiff commissions for those services rendered." Western was not engaged by SCI to solicit orders for or to sell "goods." Under the Agency Agreement, Western was to provide "marketing and creative publishing services." *Franklin*, 2007 WL 2071914, at *5. As Judge Victoria Roberts of this District noted in *Shocker v. Guardian Alarm Co. of Mich*., No. 07-15059, 2008 WL 3200623, at *16 (E.D. Mich. Aug. 5, 2008), "[t]he implication derived from *Mahnick* is that the relevant question under the MSRCA is what type of work 'predominates.'" Here, the predominant work contemplated by the Agency Agreement was the creative, marketing and placement services that Western was to provide for SCI. Western was engaged by SCI to design and place advertisements in various media outlets to enhance SCI's marketing of its funeral and cremation services. The Court finds no genuine dispute of material fact that these advertising services did predominate the work performed by Western under the Agency Agreement with SCI and concludes that Western would not be considered a sales representative who contracted with SCI "for the solicitation of orders or sale of goods" under the SCRA. SCI is entitled to summary judgment on Western's claim for unpaid

commissions under the SCRA.

**E.    Defendants are Entitled to Summary Judgment on Western's Claim for Unjust Enrichment (Count V)**

The theory underlying a claim of unjust enrichment is that "the law implies a contract to prevent unjust enrichment, which occurs when one party receives a benefit from another the retention of which would be inequitable." *Martin v. East Lansing School Dist.*, 193 Mich. App. 166, 177 (1992). "The process of imposing a "contract-in-law" to prevent unjust enrichment is an activity which should be approached with some caution." *Estate of McCallum*, 153 Mich. App. 328, 335 (1986). "Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it." *Id.* "[A] contract will be implied only if there is no express contract covering the same subject matter." *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 478 (2003).

Apparently conceding that express contracts exist that cover the subject matter of its unjust enrichment claim, Western responds that "Western's claim for unjust enrichment is viable should this Court elect to rescind the Contract." (ECF No. 82, Pl.'s Resp. 20.) While it is somewhat unclear which "Contract" Western refers to in this claim, it appears to be a reference to the NDA, about which Western claims that the parties were "mutually mistaken." The Court has already rejected Western's claim that the parties were "mutually mistaken about the coverage of the NDA." To the extent that the unjust enrichment claim seeks compensation for Western's advertising services, there is no dispute that the Agency Agreement was an express agreement covering that work. The parties rights and obligations are governed by the enforceable contracts which they executed, the NDA and the Agency Agreement, and therefore SCI is entitled to summary judgment on Western's claim for

unjust enrichment.

**F.**     **Defendants are Entitled to Summary Judgment on Western's Claim of Innocent Misrepresentation (Count VI)**

To establish a claim of innocent representation "it is necessary to show that not only does the victim suffer injury, but also the injury must inure to the misrepresenter's benefit." *United States Fidelity & Guaranty Co. v Black*, 412 Mich. 99, 118 (1981). Here, Western claims that SCI's divulgence of the information that Young shared with Sangalis resulted in the loss of the business relationship Western enjoyed with Axcess, as well as the monetary loss Western suffered defending itself against the lawsuit by Axcess. However, neither of these losses inured to the benefit of SCI. Western argues that SCI did benefit from the information divulged by Young because that information was the catalyst for the investigation into Axcess's billing practices, which resulted in SCI's termination of "a vendor involved in misdeeds." ECF No. 82, Pl.'s Resp. 22. However, this "gain" to SCI, i.e. ferreting out and dismissing a disloyal vendor, is not the "loss" or injury that Western claims to have suffered, i.e. Western's loss of a business relationship with Axcess and legal fees incurred in defending against the Axcess lawsuit. Western has proffered no evidence that the injury it suffered, losing its business relationship with Axcess or the monetary loss suffered in defending the Axcess lawsuit, inured to the benefit of SCI and its innocent misrepresentation claim fails for this reason alone.

Moreover, an innocent misrepresentation claim requires the presence of privity of contract between the parties:

> Briefly then, while the traditional and innocent misrepresentation actions are substantially similar, they are also significantly different. On the one hand, the innocent misrepresentation rule differs in eliminating scienter and proof of the intention that the misrepresentation be acted upon. However, on the other hand, the innocent misrepresentation rule adds the requirements that the misrepresentation be

30

made in connection with making a contract and the injury suffered by the victim must inure to the benefit of the misrepresenter. Actually what this means is this: while it is unnecessary to show that the innocent misrepresenter knew his representation was false, it is necessary to show that not only does the victim suffer injury, but also the injury must inure to the misrepresenter's benefit. It also means, and this is the major legal issue in this case, that it is unnecessary to prove separately that the represener intended that the victim rely on the misrepresentation, because the representation must be made "in a transaction between them", where the misrepresenter should realize that the misrepresentation would be relied upon . . .

*Fidelity & Guaranty*, 412 Mich. at 117-18 (1981).   To the extent that Western's innocent misrepresentation claim is premised upon the alleged oral confidentiality agreement that this Court found unenforceable, *see supra* Section IIIB, there was no privity of contract and therefore there can be no claim of innocent misrepresentation based upon that alleged agreement.   SCI is entitled to summary judgment on Western's innocent misrepresentation claim.

### G.   Defendants are Entitled to Summary Judgment on Western's Claim for Tortious Interference With Western's Business Relationship With Axcess

Western strains to style its claim as one for tortious interference with its business relationship with Axcess:

"'The elements of tortious interference with a business relationship are [1] the existence of a valid business relationship or expectancy, [2] knowledge of the relationship or expectancy on the part of the defendant, [3] an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and [4] resultant damage to the plaintiff.'" *Mino v. Clio Sch Dist*, 255 Mich. App. 60, 78; 661 NW2d 586 (2003), quoting *BPS Clinical Laboratories v. Blue Cross & Blue Shield of Mich*, 217 Mich. App. 687, 698-699; 552 NW2d 919 (1996). A plaintiff must show that the defendant intentionally committed a per se wrongful act or committed a lawful act "'with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.'" *CMI Int'l, Inc v. Intermet Int'l Corp*, 251 Mich. App. 125, 131; 649 NW2d 808 (2002), quoting *Feldman v. Green*, 138 Mich. App. 360, 378; 360 NW2d 881 (1984). "'Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference.'" *Mino*, 255 Mich. App. at 78, quoting *BPS Clinical Laboratories*, 217 Mich. App. at 698-699.

*Kocenda v. City of Troy*, No. 290346, 2010 WL 1873320, at *2 (Mich. Ct. App. May 11, 2010). While SCI's actions in divulging the information provided by Young may have resulted in the termination of the relationship between Western and Axcess, there is no evidence that SCI divulged the information for the purpose of interfering with that relationship. There is no evidence that the information was divulged for any purpose other than SCI's own internal investigation of a vendor who had been accused of unethical billing practices. It certainly was of no competitive advantage to SCI that the relationship between Axcess and Western was ruined as a result of the investigation. Western's claims simply do not state a claim of tortious interference with business relationship and SCI is entitled to summary judgment on Count VII of the Complaint.

## IV.    CONCLUSION

The Court concludes that genuine issues of material fact remain on Western's claim for $53,668 in commissions allegedly due under paragraph 17 of the Agency Agreement (Count III of the Complaint). On this claim, the parties' competing reasonable interpretations of the Agency Agreement preclude granting summary judgment to either party. This claim will proceed to trial.

For the reasons stated above, Defendants are entitled to summary judgment on the remaining claims stated in Plaintiff's Complaint (Counts I, II, IV, V, VI and VII).

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  December 10, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 10, 2014.

<u>s/Deborah Tofil</u>                           
Case Manager